# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>ON MARINE SERVICES COMPANY LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 20- 20007<br><br>Document No. ____ |

## DECLARATION OF KEVIN J. WHYTE IN SUPPORT OF
## CHAPTER 11 PETITION OF ON MARINE SERVICES COMPANY LLC

I, Kevin J. Whyte, hereby declare under penalty of perjury:

1. I am a director and the Senior Vice President Legal and Secretary of ON Marine Services Company LLC ("ON Marine" or the "Debtor"). In those capacities, I have direct knowledge about and involvement in the management of various aspects of ON Marine's remaining business affairs. I am an attorney and am licensed to practice before the courts of the Commonwealth of Pennsylvania. I have personal knowledge of ON Marine's history and current status.

2. Concurrently with the filing of this declaration (the "Declaration"), on the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court"), thereby commencing the above-captioned chapter 11 case (the "Chapter 11 Case").

3. The purpose of this Chapter 11 Case is to resolve the approximately 6,000 asbestos-related personal injury claims that are pending against ON Marine. ON Marine has no ongoing business operations. As such, the Debtor is not seeking extensive relief in the form of first day motions typically filed in chapter 11 cases. Nevertheless, the Debtor has filed a number of administrative motions relevant to the conduct of this Chapter 11 Case, which will enable the

Debtor to efficiently administer its estate and affairs. The Debtor anticipates such administrative motions being heard on regular notice, rather than conducting a traditional emergency "first day" hearing.

4. I submit this Declaration to assist the Bankruptcy Court and other parties in interest in understanding the circumstances that led to the commencement of this Chapter 11 Case and in support of the Debtor's chapter 11 petition for relief.

5. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my knowledge and review of relevant documents (including the Debtor's books and records), or my opinion based on my experience, knowledge, and information concerning the Debtor's history, its asbestos-related litigation issues, and its current financial condition, especially as it relates to several insurance settlements entered prior to the Petition Date. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

6. Part I of this Declaration provides an overview of the Debtor's corporate history. Part II of this Declaration summarizes the circumstances leading to the commencement of this Chapter 11 Case. Part III discusses the objectives of this Chapter 11 Case.

## I. THE DEBTOR AND ITS HISTORY

### A. Ferro Engineering And Its Asbestos Products

7. The Ferro Engineering Company was incorporated as an Ohio corporation on October 9, 1929. In 1932, The Ferro Engineering Company merged into Columbia Transportation Company, a Delaware corporation. On October 17, 1957, Columbia Transportation Company was renamed Oglebay Norton Company, a Delaware corporation, and Ferro Engineering became a division (the "Ferro Division") of Oglebay Norton Company.

8. The Ferro Division operated as an unincorporated division of Oglebay Norton Company from 1957 until 1998, when the Ferro Division ceased operations. At various times during its existence, the Ferro Division manufactured and sold refractory products for use exclusively in steelmaking.

9. More specifically, the Ferro Division's refractory products insulated "hot tops"—the tops of ingot molds into which molten steel was poured. The only place these products were used was in the open hearth departments of integrated steel mills. These "hot top" products, which included both board-type material as well as castable material, were single-use products, meaning that they could only be used for one pour of molten steel. The products were consumed by heat during the steelmaking process.

10. By the mid-1940s, certain of the Ferro Division's "hot top" products contained asbestos as an intentionally included ingredient. The Ferro Division ceased production of all but one of these asbestos-containing "hot top" products in 1974. No asbestos-containing "hot top" products were manufactured or sold by the Ferro Division after 1978.

**B. Corporate History of ON Marine**

11. ON Marine, the Debtor in this Chapter 11 Case, is the continuation of the entity formerly known as Oglebay Norton Company, as part of which the Ferro Division operated as an unincorporated division.

12. In 1999, Oglebay Norton Company changed its name to ON Marine Services Company and became a wholly owned subsidiary of a newly formed company known as Oglebay Norton Company, an Ohio corporation ("ON Parent"). Carmeuse Lime, Inc. ("Carmeuse") acquired all of the issued and outstanding shares of ON Parent in February 2008

(the "Acquisition"). ON Marine Services Company ceased all active business operations in 2010.

  13. At the end of 2011, ON Marine Services Company was converted to a Delaware limited liability company. That Delaware limited liability company—ON Marine Services Company LLC—is the Debtor in this Chapter 11 Case. Also at the end of 2011, ON Parent converted from an Ohio corporation to an Ohio limited liability company. ON Parent is the sole member of the Debtor.

  14. From the time of the Acquisition until the present, ON Parent and ON Marine have each continued their separate corporate existences, and neither entity has ever been merged into Carmeuse. As of the time of the Acquisition, all administrative and executive functions of ON Parent and ON Marine were moved from Cleveland, Ohio to Pittsburgh, Pennsylvania, and those functions continue to be served from Pittsburgh as of the present.

  C. **2004 Bankruptcy Case**

  15. In 2004, ON Marine was a debtor in a jointly-administered chapter 11 bankruptcy case filed in the United States Bankruptcy Court for the District of Delaware titled *In re ONCO Investment Company, et al.*, Bankr. Case No. 04-10558 (the "2004 Chapter 11 Case"). The 2004 Chapter 11 Case involved over 30 entities that existed as parts of the same corporate family under the ultimate parent ONCO Investment Company, a Delaware corporation.

  16. The 2004 Chapter 11 Case was precipitated by unfavorable business conditions the debtors in that proceeding were facing at the time. Although ON Marine faced significant asbestos-related liabilities at the time of that case (as more fully described in Section II below), aside from a certain number of claims that were resolved pursuant to bankruptcy court-approved settlement agreements, all asbestos-related liabilities of ON Marine passed

- 4 -

through the 2004 Chapter 11 Case.  As a result, ON Marine resumed defending and resolving those cases in the tort system after the debtors' reorganization plan was confirmed and became effective in 2005.

## II.     EVENTS LEADING TO COMMENCEMENT OF THIS CHAPTER 11 CASE

### A.     Asbestos-Related Claims and Insurance

17.     For decades, ON Marine has been named as a defendant in thousands of asbestos-related personal injury lawsuits, in which claimants seek money damages for personal injury and wrongful death alleged as a result of exposure to asbestos-containing products manufactured and sold by the Ferro Division and/or ON Marine (the "Asbestos Tort Claims").  Since 1983, over 182,000 Asbestos Tort Claims have been asserted against ON Marine in the tort system.

18.     As of October 31, 2019, approximately 6,000 Asbestos Tort Claims were pending against ON Marine in 18 states.  The claims involve allegations of four general types of asbestos-related disease:  approximately 13% of the claims assert an alleged diagnosis of mesothelioma; 25% assert an alleged diagnosis of lung cancer; 9% assert an alleged diagnosis of cancers other than lung cancer, such as esophageal cancer or colon cancer; and in 53% of the claims, claimants seek recovery for asbestosis or for a disease that was not articulated on the face of the claimant's pleading.  In recent years, approximately 62% of the cases filed seek recovery for some form of cancer.  Historically, 95% of Asbestos Tort Claims asserted against ON Marine have been dismissed without payment.

19.     Over the same period, ON Marine has been named as a defendant in a far smaller number of asbestos-related cases arising under the Merchant Marine Act of 1920, 46 U.S.C. § 30104 (commonly referred to as the "Jones Act"), in which claimants seek money

damages for personal injury arising from claimants' exposure to asbestos aboard lake vessels owned and operated by ON Marine and/or its predecessor entities (the "Jones Act Claims" and, together with the Asbestos Tort Claims, the "Asbestos Claims").

20. As of the Petition Date, the Debtor estimates that approximately 6,000 Asbestos Tort Claims and one Jones Act Claim remain pending.

21. ON Marine has funded its defense and resolution of Asbestos Tort Claims by drawing upon its historic liability insurance program. This insurance program consisted of various primary and excess-layer policies issued by various insurers prior to 1984.

22. ON Marine's historic liability insurance profile has been eroded significantly due to the payment of defense and indemnity costs relating to Asbestos Tort Claims. Moreover, certain of the excess insurance that remains available (*i.e.*, not exhausted, not settled, and not insolvent) provides no coverage for defense costs.

23. As of the Petition Date, what remains available and directly accessible from ON Marine's coverage profile for Asbestos Tort Claims are excess insurance policies issued by two insurers: Fireman's Fund Insurance Company ("Fireman's Fund") and Federal Insurance Company ("Federal"). Fireman's Fund has been contributing a share of payments for defense and indemnity costs for Asbestos Tort Claims under certain excess policies since 2012. Federal has not made any payments under its policies prior to the Petition Date, as it disputes (among other things) whether coverage obligations under any of its policies have attached.

24. As of the Petition Date, ON Marine had been paying 57.5% of each dollar of defense and indemnity cost for Asbestos Tort Claims, with the rest being funded under policies issued by Fireman's Fund.

25. ON Marine has separately funded liabilities arising from Jones Act Claims through recoveries against certain historic maritime liability insurance arrangements it secured through "protection and indemnity" clubs. The coverage that is available to ON Marine through these clubs is on a reimbursement basis only; that is, ON Marine cannot obtain coverage until it first pays a covered liability out of its own funds.

26. In addition, ON Marine is a party to an insurance settlement agreement that it reached in 2018 with Allstate Insurance Company, solely as successor-in-interest to Northbrook Excess and Surplus Insurance Company, formerly Northbrook Insurance Company ("Northbrook"). Under that agreement, ON Marine is scheduled to receive a $3,125,000 installment payment from Northbrook on or before July 30, 2020.

**B.      Events Leading to Filing**

27. After decades of relying on insurer contributions and insurance recoveries to fund the defense and indemnity costs arising from the Asbestos Tort Claims, ON Marine finds itself now facing two significant problems. *First*, its reserve of funds available to pay its share of defense and indemnity costs is dwindling, and soon will be exhausted; and because it has had no revenue-producing operations for many years, it has no means of generating additional funds for this purpose. *Second*, even if ON Marine succeeds in accessing coverage that remains available in its historic insurance profile, it likely would still have to fund insolvency gaps and some portion of defense costs on its own, and it lacks the means to do so. Additionally, ON Marine faces an inability to fund Jones Act Claims so as to facilitate the reimbursement coverage that remains available for those claims. Simply stated, the Debtor has reached the point at which its traditional method of dealing with Asbestos Claims is no longer economically feasible.

28. This situation creates difficulties for asbestos claimants, as well. If the Debtor is unable to continue to fund the defense and resolution of the Asbestos Claims, it is likely that asbestos claimants will begin a "race to the courthouse" to recover whatever remains available as fast as they can. If this happens, it is likely that many claimants who have legitimate claims, but who lose that race, will be unable to recover anything from ON Marine.

29. As a result, in consultation with its counsel, the Debtor determined that it is in its best interests, as well as the best interests of its asbestos-related creditors, for the Debtor to monetize its remaining insurance and commence this Chapter 11 Case to effect a fair and efficient distribution to those creditors.

### C. Insurance Settlements Incident to Bankruptcy Filing

30. To that end, prior to the Petition Date, the Debtor conducted extensive, good faith negotiations with Fireman's Fund and Federal. Those negotiations resulted in settlement agreements that monetize the policies issued by those insurers in the aggregate amount of $27,850,000, with $18,250,000 from Fireman's Fund and $9,600,000 from Federal.

31. Through these settlement agreements, the Debtor has resolved various issues regarding the scope and accessibility of coverage that remains available to it under the now-settled policies. For instance, Fireman's Fund previously had agreed to pay only 42.5% of defense and indemnity costs for those claims, thereby leaving ON Marine to fund the majority share of those costs, a task for which it no longer has the requisite financial wherewithal. The Debtor's settlement with Fireman's Fund eliminates that as an issue, and makes the settlement available to pay 100 cents of every dollar of a claim. Similarly, the settlements with both Fireman's Fund and Federal resolve issues involving the attachment of excess policies and disputes over the proper exhaustion of underlying policies. Without these resolutions, it seems

likely that ON Marine could have expected these disputes to be subject to insurance coverage litigation, which ON Marine has no other means of funding.

32. The settlement agreements are premised on the Debtor's desire and intent to commence this Chapter 11 Case and to establish a liquidating trust to resolve all current Asbestos Claims that are submitted to a liquidating trust before an applicable bar date. There is no indication that these settlements would have been achievable outside such a context. Without these settlements and absent the filing of this Chapter 11 Case, ON Marine would have been unable to pay the costs of Asbestos Claims or the costs of pursuing additional insurance coverage under its remaining coverage profile.

33. It is anticipated that a portion of the proceeds of the settlement with Fireman's Fund will be used to fund this Chapter 11 Case. The Fireman's Fund settlement calls for Fireman's Fund to make a payment of $1,250,000 to the estate after the Debtor files a motion seeking the Bankruptcy Court's approval of its settlement agreement. The agreement provides that the settlement proceeds may be used to fund costs and expenses associated with the Chapter 11 Case.

34. I believe that the settlements are fair and equitable and in the best interests of the estate given potential litigation outcomes. Among the considerations that led to this conclusion are the following:

<u>Fireman's Fund Settlement Agreement</u>

a. The Fireman's Fund settlement agreement essentially makes the entire remaining limits of two lower-level excess policies which currently contribute to funding the Debtor's asbestos-related defense and indemnity costs immediately available, whereas previously, Fireman's Fund had agreed to pay only 42.5% of each dollar of those costs under those policies.

b. The Fireman's Fund settlement agreement also provides a recovery on the limits of higher-level Fireman's Fund excess policies that have not yet

- 9 -

        attached, and that would not attach until underlying layers that do not cover defense costs or that are insolvent were accounted for. I understand that the Debtor likely would be responsible for making up the "gaps" that result from that underlying coverage, and it lacks the financial wherewithal to do so. As a practical matter, therefore, that coverage might be entirely inaccessible absent the Fireman's Fund settlement agreement.

c.     Additionally, in the absence of the Fireman's Fund settlement agreement and in the event of the breakdown of Fireman's Fund's current commitment to fund the Debtor's asbestos-related defense and indemnity costs, Fireman's Fund could raise a host of issues impacting its coverage obligations under both the lower-level and higher-level excess policies, including claims involving issues of allocation, contribution rights against the Debtor's other settled insurers, and the scope of the Debtor's coverage rights under the settled policies. I understand that Ohio law, which likely would govern these disputes, is not settled on all of these issues. Litigation of these issues would be complex and expensive, with no predictability of whether the Debtor's positions would prevail.

Federal Settlement Agreement

d.     Federal disputed that it had any present obligations to provide coverage for Asbestos Claims under any of the settled policies, due to the Debtor's failure to properly exhaust the applicable underlying insurance. Although the Debtor believes there is significant support under applicable policy language in both the settled policies and the underlying insurance that at least one of the settled policies has immediate payment obligations, I understand from the Debtor's counsel that we are aware of no case precedent under Ohio law that is directly on point. Federal has made no contribution toward covering the Debtor's asbestos-related defense and indemnity costs to this date, and if Federal was to prevail on its position, it is conceivable that none of its policies could attach for some time (if at all). The Federal settlement agreement eliminates these risks by providing for liquidation of the settled policies and making the settlement proceeds available shortly after the Court approves the applicable motion.

e.     Federal also raised issues about the proper share of any allocation of coverage responsibilities to any of the settled policies, particularly in view of settlements that the Debtor reached over 15 years ago which involved significant discounts off the settled policies' coverage limits. Federal asserted that its rights to contribution against those insurers—which, as a result of indemnification agreements between those insurers and the Debtor, would fall on the Debtor itself—compelled an allocation much smaller than the Debtor would otherwise seek from Federal. I understand that Ohio law, which likely would govern a dispute on this issue, is not settled, and litigation over a dispute on this issue would promise to be

complex and expensive, with no predictability of whether the Debtor's position would prevail.

    f.    None of the settled policies defines covered "Loss" to include defense costs. Absent this Chapter 11 Case—which was a critical underpinning of the Federal settlement agreement—even if Federal began making some contribution toward coverage of asbestos-related indemnity costs, the Debtor would have had to bear all defense costs that otherwise could have been allocated to a Federal policy. The Debtor lacks the financial wherewithal to do so. The Chapter 11 Case and the Federal settlement agreement together act to eliminate this as an issue for the Debtor.

35.    Given the significant risks inherent in litigating any dispute with Fireman's Fund and Federal in relation to their policies, the recovery provided for in the insurance settlement agreements of $27,850,000 is significant and propitious for the Debtor and its creditors. Considering the range of reasonable outcomes of those disputes—which at the very least would include the possibility of no recovery at all on the higher-level excess policies—the resolutions afforded by the insurance settlement agreements certainly exceeds the lowest point in the range of reasonableness.

36.    Further, the insurance settlement agreements are in the paramount interests of creditors because they (i) resolve and thereby eliminate the disputes between the Debtor and Fireman's Fund and Federal over the accessibility of additional coverage for Asbestos Claims under the settled policies, (ii) make the settlement proceeds more immediately accessible than had the Debtor litigated with Fireman's Fund and Federal or awaited the normal delays attendant to the tort system, and (iii) facilitate the fair and efficient distribution of proceeds to the Debtor's asbestos creditors.

**D.**    **Debtor's Current Status**

37.    The Debtor's sole business is defending and, when appropriate, settling the Asbestos Claims, funded primarily through the use of insurance recoveries. ON Marine has manufactured no asbestos-containing refractory products since 1978. Since 2010, ON Marine

has had no revenue-generating business operations whatsoever.  Currently, ON Marine has no employees; it owns no real property; it has limited personal property, primarily consisting of cash, certain investments, and insurance receivables; it has no secured debt; and its only known non-asbestos unsecured debts are to law firms that were defending ON Marine against Asbestos Claims in the tort system.

38. ON Marine obtains professional services for financial and legal matters (for counseling on and the coordination and management of its asbestos-related matters) from employees of Carmeuse, for which it pays Carmeuse a quarterly service fee of approximately $25,000.  The Debtor also compensates its Vice President and Treasurer, Bruce P. Inglis, in connection with his services in managing the Debtor's asbestos-related matters, including the preparation of financial statements and the analysis and management of Asbestos Claims information, at an hourly rate of $275.  The Debtor intends to continue to use Mr. Inglis's services in that role during the Chapter 11 Case.

### III. PURPOSE OF THIS CHAPTER 11 CASE

39. The Debtor filed this Chapter 11 Case for the purpose of resolving all existing Asbestos Claims.  The Debtor does not intend to address in this Chapter 11 Case so-called future claims or demands—that is, claims which are unknown today, but which may arise in the future based on past exposure to asbestos on account of ON Marine's products or operations.

40. To resolve current Asbestos Claims, the Debtor intends to seek approval of the insurance settlement agreements referenced above and the confirmation of a chapter 11 plan of liquidation as soon as practicable.  The plan will provide for the establishment of a liquidating trust into which the remaining proceeds from the insurance settlements and any rights

to receive insurance proceeds or coverage from any other insurers that may have obligations to ON Marine will be transferred.  The liquidating trust will assume liability for all current Asbestos Claims and will use its assets to resolve the Asbestos Claims.  By monetizing the settling insurers' policies and establishing procedures to govern distributions from the liquidating trust, the trust will be able to resolve, value, and, if eligible, pay current Asbestos Claims that are submitted to the liquidating trust before an applicable bar date in a fair and efficient manner.  Together, approval of the insurance settlement agreements and confirmation of a plan of liquidation will ensure a fair and equitable distribution among current asbestos claimants.

41. After its current Asbestos Claims and insurance assets have been transferred to the liquidating trust, the Debtor or the liquidating trust will seek the Court's approval to dissolve and cancel the Debtor's corporate existence.

42. To facilitate the objectives outlined above through this Chapter 11 Case, the Debtor intends to file a number of non-emergency motions pertaining to administrative matters.  Among them will be a motion seeking this Court's approval to serve notices on counsel of record for holders of Asbestos Claims in lieu of serving those holders personally.  This approach will capitalize on extensive information the Debtor has regarding the Asbestos Claims and the attorneys who are handling those claims on behalf of their holders.  Namely, the Debtor's defense counsel tracks Asbestos Claims against the Debtor by maintaining a database that identifies the names, but not the addresses, of the holders of the Asbestos Claims.  Defense counsel's database, however, includes the addresses for such holders' respective counsel of record, and all communications regarding the Asbestos Claims and the various pending lawsuits are conducted through counsel.

43. The Debtor believes that relying on these counsel to accept service on behalf of their clients will ultimately result in the claimants receiving superior notice than they would if the Debtor had attempted to deliver notice directly to the claimants themselves. This approach also will ease the Debtor's administrative burden of sending notices to thousands of claimants.

*[The remainder of this page was intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 2, 2020

_____
Kevin J. Whyte
Senior Vice President Legal and Secretary
ON Marine Services Company LLC

*[Signature Page to Declaration of Kevin J. Whyte in Support of*
*Chapter 11 Petition of ON Marine Services Company LLC]*